UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

*** Filed ***
11:35 PM, 09 Jan, 2026
U.S.D.C., Eastern District of New York

*rec. 1/12

_____

Alla Bronskaya, Plaintiff,

   v.                                                           Case No: CV25-4395-TAM

Osaic, Inc., Defendant.

_____

PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(2), pro se Plaintiff respectfully moves for leave to file the attached Second Amended Complaint. The Court should "freely give leave when justice so requires" Foman v. Davis, 371 U.S. 178, 182 (1962).

Plaintiff's previously filed First Amended Complaint inadvertently omitted a key factual allegation due to pro se status and oversight: Plaintiff neglected to identify her supervisor, Lana Cafaro, as a Senior Executive Assistant. Ms. Cafaro was a Senior Executive Assistant who supported Osaic's Chief Executive Officer, Jamie Price, and served as a Lead Executive Assistant at Osaic. Her leadership role was apparent in that she routinely sent emails outlining standard procedures for Defendant's executive assistants, owned the agendas for executive assistant meetings, and led these meetings. In addition, Plaintiff clarified in the proposed Second Amended Complaint that one of the first emails on which Ms. Cafaro directed Plaintiff to cc her was a routine message to internal colleagues concerning birthdays and work anniversaries.

These clarifications are important for two reasons. First, they help to similarly situate Plaintiff in material ways. Although executive assistants at Osaic did not all share the same direct supervisor, they were subject to the same Lead Executive Assistant—Ms. Cafaro—who exercised de facto leadership and influence over executive assistant standards and practices across the organization. Second, clarifying the nature of one of the first emails on which Ms. Cafaro directed Plaintiff to copy her shows that this email was a routine internal message, not a highly sensitive or exceptional communication, supporting Plaintiff's allegation that the cc request was used as a vehicle for heightened scrutiny of Plaintiff's English usage rather than for any legitimate business necessity. The proposed amendment is narrow, adds no new legal claims or parties, and simply clarifies existing facts supporting Plaintiff's discrimination and retaliation claims.

The case remains in its early stages and discovery has not yet occurred, so allowing this clarification will not prejudice Defendant or delay the proceedings. To the extent the Court deems it appropriate, Defendant can respond to the Second Amended Complaint on a normal schedule.

A copy of the proposed Second Amended Complaint is attached as Exhibit B.

Respectfully submitted,

Alla Bronskaya

January 9th, 2025

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Alla Bronskaya<br><br>_____<br><br>_____<br><br>_____<br><br>*(Write the full name of each plaintiff who is filing this complaint.  If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br><br><br>　　**-against-**<br><br><br>_____<br><br>Osaic, Inc.<br><br>_____<br><br>_____<br><br>*(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | **Complaint for Employment Discrimination**<br><br>Case No. ___CV25-4359___<br><br>*(to be filled in by the Clerk's Office)*<br><br><br>Jury Trial:　　☑ Yes　　☐ No<br>　　　　　　　　*(check one)* |

**I.**     **The Parties to This Complaint**

**A.**     **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Alla Bronskaya |
| Street Address | 120 B 26th St, Apt 1004 |
| City and County | Queens |
| State and Zip Code | New York, 11691 |
| Telephone Number | 3476132817 |
| E-mail Address | bronskaya@gmail.com |

**B.**     **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Osaic, Inc. |
| Job or Title (if known) | |
| Street Address | 18700 Hayden Road, Suite 225 |
| City and County | Scottsdale |
| State and Zip Code | Arizona, 85255 |
| Telephone Number | 844-256-4624 |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |

2

State and Zip Code    _____

Telephone Number    _____

E-mail Address    _____
(if known)

**C.**    **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

| | |
|---|---|
| Name | Alla Bronskaya |
| Street Address | 120 B 26th St, Apt 1004 |
| City and County | Queens |
| State and Zip Code | New York, 11691 |
| Telephone Number | 3476132817 |

**II.**    **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

3

☐    Other federal law *(specify the federal law)*:

_____

☒    Relevant state law *(specify, if known)*:
    New York Executive Law § 296(1)(a),1(h),(7)
_____

☐    Relevant city or county law *(specify, if known)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

    ☐    Failure to hire me.

    ☒    Termination of my employment.

    ☐    Failure to promote me.

    ☐    Failure to accommodate my disability.

    ☒    Unequal terms and conditions of my employment.

    ☒    Retaliation.

    ☐    Other acts *(specify)*:  _____

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

2/22/24, 3/1/24, 3/4/24, 3/12/24, 3/14/24, 5/10/24, 6/14/24, 8/21/24, 8/29/24, 10/11/24

4

C.    I believe that defendant(s) *(check one)*:

    ☐    is/are still committing these acts against me.

    ☒    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

    ☐    race _____

    ☐    color_____

    ☐    gender/sex _____

    ☐    religion _____

    ☒    national origin _____

    ☐    age.  My year of birth is _____.  *(Give your year of birth only if you are asserting a claim of age discrimination.)*

    ☐    disability or perceived disability *(specify disability)*

    _____

E.    The facts of my case are as follows.  Attach additional pages if needed.

Please see Attachment I. Thank you!

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

5

**IV.   Exhaustion of Federal Administrative Remedies**

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

January 29th, 2025

B.   The Equal Employment Opportunity Commission *(check one)*:

☐   has not issued a Notice of Right to Sue letter.

☒   issued a Notice of Right to Sue letter, which I received on *(date)*
May 8th, 2025
.

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.   Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐   60 days or more have elapsed.
☐   less than 60 days have elapsed.

**V.   Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff respectfully requests that the Court award her monetary damages totaling $55,000, itemized as follows: (a) $20,000 in lost wages representing $10,000 in annual salary lost over two years following her termination; (b) $16,000 in lost bonuses over two years, which Plaintiff reasonably expected to receive based on her Osaic offer letter; and (c) $10,000 in unpaid overtime wages for hours Plaintiff regularly worked but did not record due to fear of retaliation. Plaintiff further seeks $19,000 in compensatory damages for the emotional distress, physical illness, and other non-economic harm caused by the discriminatory and retaliatory work environment at Osaic, including what may be permanent medical conditions requiring ongoing treatment.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  _____1/9_____, 2026.

Signature of Plaintiff        _____

Printed Name of Plaintiff    Alla Bronskaya

7



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Sudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website:  www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/08/2025

**To:** Ms. Alla Bronskaya
120 Beach 26th St, Apt 1004
FAR ROCKAWAY, NY 11691
Charge No: 520-2024-08093

EEOC Representative and email:    ROBERT CREE
Investigator
robert.cree@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Feng K. An
05/08/2025
Feng K. An
Area Office Director

**Cc:**
Gabrielle Porch
Osaic, Inc.
18700 Hayden Rd. Ste 255
Scottsdale, AZ 85255

NA NA
18700 N HAYDEN RD STE 225
SCOTTSDALE, AZ 85255

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2024-08093 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2024-08093 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**Alla Bronskaya v. Osaic, Inc.**

**Attachment I, Section E: Facts of the Case**

1. Plaintiff is of Russian national origin and has been living in the United States for more than 20 years. Plaintiff is a U.S. citizen.

2. Plaintiff's national origin is not apparent unless she discloses it directly, because her accent is very slight. As such, Defendant was not aware of Plaintiff's national origin when Plaintiff was hired. Plaintiff alleges that Defendant later became aware of her Russian national origin after she disclosed it to Supervisor Cafaro during one-on-one meetings.

3. When Defendant interviewed Plaintiff, they scheduled 4 successive interviews over the span of 9 days. Plaintiff was offered the position within 10 days of the first interview, and the Defendant's recruiter who ultimately called to offer Plaintiff the position, Jane Steill, made a point of telling Plaintiff that she was a "great fit."

4.  Plaintiff began remote employment with Defendant as an executive assistant on February 12th, 2024. Plaintiff was explicitly hired as a "remote employee, based in New York." This is an important distinction, because "work from home" (WFH) typically refers to working from a permanent residential address, while "remote" is broader, allowing for work from various locations.

5. On February 9th, 2024, Plaintiff's supervisor, Senior Executive Assistant to Osaic's CEO, Lana Cafaro, outlined a set of workplace expectations for Plaintiff via email: Plaintiff's hours would be 8:30 am-5:30 pm Eastern Time, with one hour for lunch.

6. Between February 12th and February 22nd, 2024, Supervisor Cafaro and Plaintiff had many one-on-one meetings over Zoom and Microsoft Teams. The purpose of these meetings was largely for Supervisor Cafaro and Plaintiff to get to know one another. Supervisor Cafaro stated several times that she was very excited to have a "New Yorker girl," because she felt that people from New York had a certain grit. Plaintiff mentioned that she had lived in New York long enough to consider herself a New Yorker. Supervisor Cafaro expressed a surprise and proceeded to ask Plaintiff where she was from. Once Plaintiff shared her origins, Ms. Cafaro asked Plaintiff where she learned English, and when. Ms. Cafaro also asked Plaintiff how many languages she spoke. After this initial conversation, Ms. Cafaro proceeded to re-ask Plaintiff these same questions several more times during later one-on-one meetings that took place during Plaintiff's first two weeks of employment. Plaintiff alleges that Ms. Cafaro's repeated focus on Plaintiff's origin and English language background reflects discriminatory animus based on Plaintiff's Russian national origin.

7. Within the first three weeks of Plaintiff's employment with Defendant Osaic, Plaintiff participated in an introductory meeting requested by Brian Pearce, Head of Enterprise Risk Management. During this meeting, Pearce stated that he and Supervisor Cafaro had collaborated with respect to the prior employee who held Plaintiff's position, explaining that, at Cafaro's direction, he assigned that predecessor a special workload and that she resigned on the same day the special assignment was given.

8. On February 22nd, 2024, just 11 days after Plaintiff's first day, Plaintiff had another one-on-one meeting with Ms. Cafaro, during which Cafaro outlined a new set of workplace expectations that were applicable only to Plaintiff, and that no other similarly-situated executive assistant had to follow. These expectations were not in the employee handbook and had no business justification related to Plaintiff's role. These expectations set forth that Plaintiff had to take lunch only during hours that Supervisor Cafaro considered "normal," and that Plaintiff's employment was no longer remote, but work-from-home. Ms. Cafaro stated that if Plaintiff left her "seat" for any reason during work hours, even to briefly make coffee or walk the dog, Plaintiff had to notify Ms. Cafaro.

Shortly after this meeting took place, Ms. Cafaro sent Plaintiff an email recap of their discussion. This email restated the new set of workplace requirements, so that Plaintiff would be "clear" as to what was expected. Eleven minutes after Ms. Cafaro sent this recap email about the adjusted workplace expectations, Ms. Cafaro also sent a follow-up, asking Plaintiff to confirm "that you (Plaintiff) understand the below."

Ms. Cafaro's questioning of Plaintiff's ability to comprehend plain English in this instance was the first of several in which Ms. Cafaro subjected Plaintiff's English language proficiency to extra scrutiny that did not apply to non-Russian executive assistants.

9. On March 1st, 2024, Plaintiff messaged Ms. Cafaro via Microsoft Teams to inform Ms. Cafaro that Plaintiff was leaving her "seat" to take her dog outside. Plaintiff used a single exclamation point to say, "be back in about 10 mins!" Ms. Cafaro responded by instructing Plaintiff to stop using exclamation points.

10. On March 4th, 2024, Ms. Cafaro instructed Plaintiff to cc Ms. Cafaro on an internal email sent from the Plaintiff's inbox. The email concerned team birthdays and work anniversaries. It turned out that the reason Ms. Cafaro made this request was not for information purposes, but so she could proofread Plaintiff's writing. After Plaintiff carried out Supervisor Cafaro's request, Ms. Cafaro criticized Plaintiff's writing for "extra spacing," adding "need to review before sending."

In the days that followed, Supervisor Cafaro continued asking Plaintiff to cc her on additional emails, so Cafaro could proofread them after they were already sent. Plaintiff's writing was excessively and unnecessarily scrutinized despite the fact that the writing contained no mis-spellings or incorrect grammar. It became clear that the reason Ms. Cafaro had asked Plaintiff to

be cc'd on emails was specifically so Ms. Cafaro could look for evidence to support negative employment action against Plaintiff. Had the requests been made for coaching or professional development purposes, Ms. Cafaro would have asked to see this correspondence before it was sent, when it could still be edited.

This daily surveillance caused Plaintiff extreme anxiety and significantly reduced her productivity, effects that were plainly more than petty slights or trivial inconveniences. The fact that Plaintiff's email communications came under heightened surveillance immediately after Supervisor Cafaro learned that Plaintiff was not born in the United States reflects discriminatory assumptions that Plaintiff was insufficiently proficient in English and subjected Plaintiff to national origin-based scrutiny beyond that imposed on other Osaic executive assistants who did not share Plaintiff's Russian origin. Plaintiff cannot identify comparators similarly situated in all material respects because these executive assistants, who were not of Russian national origin, did not share the same direct supervisor as Plaintiff. However, Plaintiff alleges that other executive assistants who were not of Russian national origin held comparable roles, were subject to the same company email, performance, and conduct policies, yet were not required to cc a supervisor on routine emails or submit to English-language monitoring. Furthermore, all of these non-Russian executive assistants, including Plaintiff, were under the leadership of Senior Executive Assistant Lana Cafaro, despite the fact that only Plaintiff actually reported to Ms. Cafaro. Ms. Cafaro's leadership role was apparent in that she routinely sent emails outlining standard procedures for executive assistants at Osaic, owned the agendas for executive assistant meetings, and led such meetings. Additionally, there was no legitimate, non-discriminatory reason for the extra scrutiny of Plaintiff's writing, because Plaintiff was not handling uniquely sensitive communication requiring perfection.

11. On March 12th, 2024, Plaintiff sent an email in which, due to extreme anxiety caused by Supervisor Cafaro's ongoing scrutiny and monitoring, Plaintiff did not press 'Return' after the salutation, resulting in spacing that Supervisor Cafaro labeled as improper email format. Supervisor Cafaro was cc'd on this email per her request and said that it was not "professional." Despite the trivial nature of this formatting issue, Supervisor Cafaro treated it as a significant deficiency while simultaneously demanding that Plaintiff send emails almost instantaneously, criticizing Plaintiff if a response took even approximately ten minutes. This combination of perfectionist linguistic scrutiny and unrealistic response-time expectations exacerbated Plaintiff's anxiety, further slowed her writing, and contributed to the hostile work environment to which Plaintiff was subjected.

Later that same day, Plaintiff participated in a one-on-one meeting with executive assistant Josi Luvianos. During that meeting, Luvianos shared her screen, and Plaintiff observed an email from Supervisor Cafaro concerning Plaintiff. Although Plaintiff only saw the message briefly and cannot recall its precise wording, upon information and belief Cafaro had forwarded Plaintiff's earlier email that had been labeled unprofessional to Luvianos and wrote words to the effect of

"what kind of person would do this," thereby disparaging Plaintiff's character to a colleague and further undermining Plaintiff in the workplace.

In light of the surrounding circumstances, Cafaro's remark operates as more than a stray insult. Cafaro made this personal attack after learning that Plaintiff was of Russian national origin and only after she had already subjected Plaintiff's writing and email format to unreasonable scrutiny. In that context, the comment functions as coded criticism of Plaintiff as a foreign-born English speaker. Plaintiff alleges that this pattern of criticism of her English usage and character is a form of national origin discrimination.

Plaintiff can plausibly allege that Defendant's stated concern with "professionalism" was used as a pretext to mask national origin discrimination. Specifically, Supervisor Cafaro criticized Plaintiff's writing as unprofessional for minor formatting issues such as failing to hit "Return" after a salutation, while other executive assistants subject to the same performance and conduct policies routinely sent emails containing what Cafaro herself labeled improper email format, including informal salutations, exclamation points, and emojis, without being subjected to comparable criticism or monitoring. For reference, some of these executive assistants included, but were not limited to, Tammy Smith, Holly Holmes, Vicki Kolasa, and even Ms. Cafaro herself. Plaintiff is informed and believes that these executive assistants are not of Russian national origin.  Plaintiff alone was placed under heightened email scrutiny after Cafaro learned that Plaintiff was not born in the United States, and the "professionalism" rationale was not applied consistently to non-Russian executive assistants who engaged in the same or more informal email practices. These facts support a reasonable inference that the purported professionalism standard was selectively enforced and that "professionalism" functioned as a pretext for national origin-based disparate treatment and hostile work environment in violation of Title VII and the NYSHRL. As such, Plaintiff alleges that Ms. Cafaro's repeated focus on Plaintiff's origin and language abilities, followed by differential and more burdensome expectations, demonstrates discriminatory animus based on Plaintiff's Russian national origin.

12. On March 14th, 2024, Supervisor Cafaro attempted to place Plaintiff on a performance improvement plan that cited Plaintiff's use of exclamation marks, minor extra spacing, and alleged use of emojis as purported evidence of deficient performance. The allegation regarding emojis was false: on or about March 7, 2024, Cafaro expressly granted Plaintiff permission to use emojis in Microsoft Teams messages. The plan warned that failure to correct these supposed "professionalism" issues could result in further disciplinary action, up to and including termination. Plaintiff alleges that these trivial or inaccurate stylistic criticisms were seized upon as a pretext to manufacture a negative performance record and justify adverse action, even though other non-Russian executive assistants subject to the same performance and conduct policies routinely used nonstandard spacing, exclamation points, and emojis without being threatened with discipline or termination. Moreover, other executive assistants at Osaic, who were not of Russian national origin, were not put on performance improvement plans for their use of exclamation marks, minor extra spacing, and alleged use of emojis.

13. On March 15th, 2024, Plaintiff contacted the Defendant's VP of Human Resources, Dawn Collier, to report and express concerns that she was being subjected to discrimination on the basis of a protected characteristic by her Supervisor, Ms. Lana Cafaro. Plaintiff made Collier aware that the items on the Performance Improvement Plan were extreme and mischaracterized. Plaintiff also stated that Cafaro was subjecting her to unjustified monitoring, language scrutiny, and shared the nature of the email Plaintiff saw on Josi Luvianos' screen.

14. On April 5th, 2024, Plaintiff met with Defendant's HR Business Partner Kelly Fontanetta, per Ms. Fontanetta's request. Ms. Fontanetta interviewed Plaintiff about her discrimination concerns, so it is not possible for Defendant to claim that Osaic did not know about Plaintiff's discrimination concerns.

15. Plaintiff further alleges that other non-Russian executive assistants, who were subject to the same performance and conduct policies, were issued company phones and were permitted to respond to messages within hours rather than minutes without criticism or discipline. By contrast, Plaintiff was denied a company phone after May 10, 2024, yet was still subjected to hyper-accelerated response time expectations measured in seconds and minutes. This disparate treatment in both tools provided and standards imposed reinforces that Supervisor Cafaro's stated concerns about Plaintiff's responsiveness were not grounded in legitimate business needs but operated as pretext and contributed to the hostile work environment and discriminatory conditions of Plaintiff's employment.

16. On or about mid-June 2024, Plaintiff was transferred to a new manager, Brian Pearce, the same Head of Enterprise Risk Management who had previously collaborated with Supervisor Cafaro regarding Plaintiff's predecessor. Although Pearce was, on paper, Plaintiff's direct manager, Cafaro continued to assign work directly to Plaintiff and to monitor Plaintiff's work activities in an unjustified and intrusive manner. For example, on one morning in June 2024, Plaintiff's internet service went down, and Plaintiff's Microsoft Teams status light was not green for approximately fifteen minutes while Plaintiff restarted her router; during this brief outage, Cafaro immediately messaged Plaintiff and then contacted Pearce, incorrectly alleging that Plaintiff had failed to show up for work. Whenever Plaintiff did anything Cafaro disfavored, Cafaro promptly sent an email criticizing Plaintiff's conduct and cc'd Pearce on that message. As an example, on July 2nd, 2024, Plaintiff was completing a Non-Employee Reimbursement. Having never done this task before, Plaintiff accidentally entered the wrong cost center on a form. Cafaro immediately cc'd Pearce on her response, and alleged that Plaintiff was not reading the materials "thoroughly." Plaintiff alleges that this pattern of excessive monitoring, instantaneous escalation to Pearce, and documentation of trivial, first-time mistakes was designed to portray Plaintiff as a poor performer in Pearce's eyes and to build a paper trail of supposed deficiencies to justify termination and conceal the discriminatory origins of Cafaro's disfavor. This manufactured record of minor and non-material errors ultimately culminated in a "Final Warning" letter issued to Plaintiff on or about August 21, 2024.

17. On August 21, 2024, Plaintiff received a "Final Warning" letter from Pearce. The incidents cited in the letter as evidence of Plaintiff's alleged performance deficiencies were materially inaccurate or misleading. For example, Pearce asserted that Plaintiff failed to submit his expenses for a trip to Atlanta, that the Travel & Expense team escalated this failure to him, and that, absent his personal intervention, he would have incurred a $39 late fee. In reality, the charges on Pearce's expense report (ID EXP-106998) posted between July 15 and July 17, 2024; Plaintiff created the report on July 18, 2024, and submitted it on August 1, 2024, after having to locate a missing receipt in the amount of approximately $732.29 that Pearce had not provided. Thus, the report was submitted only 18 days after the charges posted, which is well within the 30-day window before any late fee would be assessed. Plaintiff alleges that Pearce's description of these events in the "Final Warning" letter was knowingly false, and that Pearce likely did not realize Defendant Osaic's expense system preserved a detailed record of when the report was created, modified, and submitted, thereby revealing that the stated justification for discipline was pretextual.

Another example of false information in the "Final Warning" letter was Pearce's allegation that Plaintiff was unprepared for an August 1, 2024 risk assessment meeting. In fact, Plaintiff had completed the underlying work by hand and was in the process of entering the information into an Excel spreadsheet when the meeting was rescheduled to an earlier time. Plaintiff met with Pearce and explained that she needed to finish typing up the work, and Pearce agreed to this request. Nonetheless, Pearce later characterized Plaintiff as "unprepared" in the "Final Warning" letter, despite knowing that the only reason the work was not fully typed was the advancement of the meeting time, which Plaintiff alleges demonstrates that he knowingly included false information in the disciplinary documentation.

Pearce also falsely asserted in the "Final Warning" letter that Plaintiff mishandled the scheduling of a strategy session by booking his team's flights to arrive on a Monday night after the session was supposedly set to occur earlier that day. In reality, travel for his team (Kip Carevic, Rebecca Seganti, Ruel Fernandes) had been finalized on or about July 3 and July 5, 2024, well before Pearce scheduled his strategy session on or about July 8, 2024. Pearce was aware that the travel had been booked for reasons unrelated to the later-scheduled strategy session, yet he nonetheless cited this as an example of Plaintiff's supposed poor performance, which Plaintiff alleges further demonstrates his willingness to include knowingly misleading information in the "Final Warning" letter as part of a pretextual effort to justify adverse action against her.

Pearce further alleged in the "Final Warning" letter that Plaintiff improperly changed his flight from one airline to another without informing him or obtaining his permission. In reality, Pearce asked Plaintiff to identify the flight and airline on which his supervisor, Amy Hamilton, was booked; after Plaintiff provided this information, Pearce expressly instructed Plaintiff to place him on the same flight. Thus, Pearce knew which airline he would be switching to and affirmatively approved the change, yet he nonetheless cited this incident as purported misconduct

by Plaintiff, which Plaintiff alleges is another example of knowingly misleading information being used to manufacture a pretextual performance record.

Pearce also mischaracterized an instance in which Plaintiff cancelled a meeting for Amy Hamilton. In the "Final Warning" letter, Pearce asserted that Plaintiff improperly cancelled an important "Teal Gray" meeting without first seeking approval. In fact, Plaintiff cancelled the meeting immediately after seeing a conflicting calendar obligation arise, because Defendant had repeatedly instructed her to respond to scheduling conflicts as quickly as possible and had criticized her whenever responses were not nearly instantaneous. After months of pressuring Plaintiff to act faster and faster, Defendant then used this prompt cancellation—undertaken in accordance with those directives—as alleged misconduct and grounds for discipline, which Plaintiff alleges is further evidence that the performance rationale was pretextual rather than rooted in legitimate business concerns.

Upon receiving the "Final Warning" letter, Plaintiff promptly responded in writing to Pearce, Dawn Collier, and Amy Hamilton, carefully identifying and disputing the numerous inaccuracies contained in the document. In that response, Plaintiff specifically outlined each statement she could demonstrate was false or misleading, provided clarifying context where material facts had been omitted or distorted, and requested that the record be corrected to reflect the true sequence of events. Plaintiff alleges that despite this detailed rebuttal, Defendant failed to meaningfully investigate or amend the "Final Warning," further evidencing that the proffered performance concerns were pretextual rather than the product of good-faith, fact-driven evaluation.

Plaintiff is deeply troubled that a large wealth manager such as Osaic empowers senior executives, including Pearce, to freely misrepresent material facts in disciplinary documentation without apparent internal safeguards or accountability. Given that ethics and truthful communication are supposed to be at the core of any responsible wealth management enterprise entrusted with clients' retirement savings, Plaintiff is further concerned that Defendant's tolerance of such conduct by senior leadership reflects a broader disregard for the fiduciary-adjacent ethical standards that should govern its internal and external dealings.

18. On or about August 29, 2024, Plaintiff met with Pearce and Dawn Collier to discuss her performance. During this meeting, the numerous misrepresented facts contained in the "Final Warning" letter were not addressed or corrected in any meaningful detail, despite Plaintiff's prior efforts to identify and dispute those inaccuracies. Collier stated that a revised "Warning Letter" incorporating edits would be provided to Plaintiff, but no such corrected letter was ever issued.

In the same meeting, Collier again emphasized that Plaintiff's response time needed to be faster. Plaintiff explicitly asked Collier and Pearce to specify an objective response-time expectation so that she could conform her conduct to their stated standard and preserve her employment. Plaintiff was genuinely attempting to meet Defendant's requirements, but remained confused because Osaic had criticized her both for allegedly responding too slowly (including responses

within approximately 10 minutes) and for responding too quickly (as in the "Teal Gray" meeting cancellation).

In response to Plaintiff's request for a clear metric, Collier stated, in substance, that "Brian is not putting time numbers, or a time clock, on it." Plaintiff alleges that Defendant's refusal to articulate any concrete response time standard, while simultaneously fixating on response time as a central performance issue, demonstrates that Osaic was deliberately setting her up to fail so that it could continue to manufacture a performance-based justification for adverse action. Plaintiff further alleges that this inconsistent and shifting standard supports a reasonable inference that the disciplinary process was rooted in discriminatory animus rather than legitimate performance concerns.

19. On September 6, 2024, Plaintiff contacted Defendant's Chief Human Resources Officer, Jeffrey Green, to report that she reasonably believed she was being subjected to discriminatory treatment on the basis of a protected characteristic. Plaintiff had previously raised concerns of discrimination to Defendant on March 15, 2024.

Mr. Green responded on September 10, 2024, stating that he would investigate Plaintiff's concerns.

On September 15th, 2024, Plaintiff followed up to advise Mr. Green that the "Final Warning" letter she received contained multiple false and misleading statements that she had disputed in writing, and that she believed Supervisor Pearce and Supervisor Cafaro had collaborated in generating and endorsing those inaccuracies. Plaintiff specifically raised concerns that Pearce's alignment with Cafaro, despite the factual errors Plaintiff identified, reflected a coordinated effort by senior management to manufacture a performance-based record to justify adverse action.

On October 9, 2024, Mr. Green informed Plaintiff that he found no evidence of discrimination. Two days later, on October 11, 2024, Defendant terminated Plaintiff's employment. The close temporal proximity between Plaintiff's protected complaints and her termination, together with fabricated and exaggerated performance problems, support a reasonable inference that Osaic terminated Plaintiff in retaliation for her complaints of discrimination.

20. The experience of working at Osaic took a severe toll on Plaintiff's health. During the summer of 2024, Plaintiff began experiencing painful blisters on her hands that she initially believed were shingles, along with nausea, headaches, fever, chills, and compromised vision, which are symptoms that are consistent with viral reactivation. Plaintiff repeatedly informed Supervisors Pearce and Cafaro that she felt so ill she needed to lie down during the workday and ultimately exhausted all of her sick leave.

At the end of September 2024, Plaintiff's physician prescribed antiviral medication. Months after Osaic terminated Plaintiff's employment, Plaintiff discovered that if she stopped taking the antiviral medication, the blisters on her hands would recur within approximately 48 hours. In

July 2025, Plaintiff consulted a specialist whose laboratory testing showed that Plaintiff did not have shingles but instead had herpetic whitlow caused by the HSV-1 virus. HSV-1 is a virus that typically remains latent in individuals with a healthy immune system and can reactivate when the immune system is compromised, including by extreme stress. A patient is considered positive for HSV-1 when the HSV-1 IgG Type Specific AB antibody level exceeds 1.10; Plaintiff's result was 58.00.

Prior to her employment at Osaic, Plaintiff had never experienced herpetic whitlow. When this illness began, Plaintiff's employment at Osaic was the only materially different factor in her life circumstances. As of January 9, 2026, Plaintiff continues to take antiviral medication to suppress herpetic whitlow, and if she discontinues the medication, her symptoms return within approximately 48 hours. Plaintiff is now facing the prospect of seeking care from specialists who do not accept insurance in an effort to restore her health and immune function. Plaintiff respectfully asks the Court to recognize that the stress and conditions of her employment at Osaic, and the events described in this Complaint, have resulted in what may be a persistent and potentially permanent dysregulation of her immune system that gravely affects her health and quality of life.